IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 00-60465

---

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee-Cross-Appellant,

        versus

CHARLES HARRIS,

                              Defendant-Appellant-Cross-Appellee.

---

Appeals from the United States District Court
for the Northern District of Mississippi

---

June 11, 2002

Before GARWOOD and WIENER, Circuit Judges and VANCE,[1] District
Judge.

GARWOOD, Circuit Judge:

        Defendant-Appellant  Charles  Harris  (Harris)  appeals  his

conviction under 18 U.S.C. § 242.  The United States of America

(the Government) cross-appeals the sentence imposed by the trial

---

        [1]District Judge of the Eastern District of Louisiana, sitting by
designation.

court.  Harris was convicted in a jury trial of using excessive force during the course of an arrest.  The sentencing court imposed a sentence including imprisonment for thirteen months, departing downward from the sentencing range established by the United States Sentencing Guidelines (the Guidelines). We affirm the conviction and the district court's decision to depart downward.  This opinion addresses those two issues.  For the reasons stated in the separate opinion of Judge Wiener, Judge Vance concurring, a majority of this panel concludes that the extent of the departure has not been adequately justified, and accordingly this court vacates and remands the sentence.

## Facts and Proceedings Below

On May 9, 1998, Harris, Chief of Police for the Town of Golden, Mississippi, arrested Geraldo Lopez (Lopez) for public drunkenness. Harris was indicted for using excessive force during the course of the arrest by "willfully" striking Lopez "with a police baton, a dangerous weapon, . . . resulting in bodily injury" to Lopez, in violation of 18 U.S.C. § 242.[2]  On February

---

[2]18 U.S.C. § 242 provides:

> "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his

2

15, 2000, after a two-day trial, the jury rendered a guilty verdict.

On the evening of the arrest, Lopez, a Mexican citizen, was attending a party at a residence in Golden. Harris was the only Golden officer on duty that night. Responding to a complaint from neighbors, Harris went to the house where the party was in progress and requested that the partygoers quiet down. They said that they would and Harris left. Shortly thereafter, the party got loud again and Harris returned to ask the partygoers to quiet down a second time. After his second visit, Harris placed a radio call to the Tishomingo County Sheriff's Department requesting backup.[3] Four Sheriff's Department officers arrived in response to Harris's call for assistance. The noise continued. Harris and three of the officers – Officers Flynt,

---

> color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death."

[3]Golden is in Tishomingo County and it was regular practice for Harris to request assistance from the Sheriff's Department when he needed it.

Trimm, and Stacy – approached the house and warned the revelers that arrests would be made if the party continued to be too noisy. The partygoers again promised to be quiet. Harris and the other officers left the house and went to a parking lot about a block away. About five minutes later, the officers heard the noise from the party resume and they returned to the house and began making arrests.

Harris arrested Lopez. The precise sequence of events from that point onward are somewhat in dispute. The testimony indicates that Lopez initially submitted to being handcuffed behind his back and to being placed in the back seat of Harris's patrol car.[4] The patrol car had a plexiglass barrier, reinforced with metal brackets and wire mesh, that separated the back seat from the front seat passenger compartment. Harris closed the car door, left Lopez alone in the back seat, and began walking back toward the house. In his trial testimony, Lopez conceded that he was drunk and that he began to thrash about in the back seat. Officers Flynt and Stacy testified that Lopez began kicking at the windows of the car. The trial testimony further established that, at this point, Harris returned to the car and opened the door near where Lopez's feet were. Lopez continued to kick at Harris. Harris told Lopez to stop kicking him and Harris struck Lopez in the shins with a police baton at least once.

---

[4]Lopez eventually pleaded guilty to a charge of resisting arrest.

After Harris closed the car door again, Lopez resumed thrashing about the car and started banging his head against the plexiglass divider.  Harris opened the car door again and, according to the testimony, again began to strike Lopez with the baton.  Gary Pounders, a neighbor and the only witness called by the defense, partially corroborated the testimony of Government witnesses.[5]  Officer Flynt testified that Harris landed blows on Lopez's face and head.  Lopez testified that Harris hit him on the left temple.  FBI agent Summerlin testified that Harris, during a non-custodial interview regarding the incident, had admitted hitting Lopez in the head.  Officer Stacy testified that he stopped Harris from hitting Lopez because Harris "had lost his composure as a law enforcement officer."  Officer Trimm testified that he approached the car and attempted to reach in and stop Lopez from banging his head.  Trimm testified that he never saw Harris strike Lopez but that Lopez had blood on his head when Trimm approached the car.  Lopez kicked Trimm in the groin and Trimm sprayed Lopez with pepper spray in an attempt to subdue him.  Lopez continued to thrash violently.  Finally, a woman who had attended the party was able to calm Lopez down.

It was determined that Lopez should be taken to the hospital because he was bleeding from the head.  Ambulance

---

[5]It appears from Pounders's testimony that he only witnessed the second of the two occasions when Harris opened the car door. Pounders testified that he saw Harris strike Lopez once on the legs and that he never saw Harris strike Lopez on the head.

operator and police officer Mike Kemp arrived on the scene. Officer Kemp testified that Harris told him that he had "knocked the s-h-i-t" out of Lopez. Kemp refused to transport Lopez in his ambulance unless an officer accompanied Lopez. Harris opted to drive Lopez to the hospital himself.

Registered Nurse Cummings was an emergency room nurse who treated Lopez at the hospital. Cummings testified that Lopez presented with two separate injuries on his head, a laceration and a hematoma. She further testified that she could not say whether or not these injuries could have been caused by a blunt instrument like a police baton. X-rays and a CT scan of Lopez's head were negative. His laceration was sutured, he was given a tetanus shot and was discharged just under two hours after his arrival at the hospital. There is no evidence he subsequently sought any further medical attention.

The district court held a sentencing hearing on June 14, 2000. The Presentence Investigation Report calculated the total offense level (including enhancements) to be 29 and a criminal history category of I. Under the Guidelines, these figures provided a sentencing range of 87 to 108 months' imprisonment. The sentencing court found that Lopez's wrongful conduct had significantly contributed to provoking the offense behavior and that a downward departure was warranted pursuant to U.S.S.G. § 5K2.10. The court sentenced Harris to a term of thirteen months

6

in prison, two years' supervised release and a $5,000 fine.

Harris appeals contending that the evidence is insufficient to support his conviction. The Government cross-appeals, contending that the district court erred in determining that downward departure was justified and that even if departure were warranted the extent thereof here granted was unreasonably large.

**Discussion**

I. Standard of Review

We review the jury's finding of guilt under a standard that is highly deferential to the verdict:

> "The standard of review for determining whether there was sufficient evidence to convict a defendant is whether the evidence, when reviewed in the light most favorable to the government with all reasonable inferences and credibility choices made in support of a conviction, allows a rational fact finder to find every element of the offense beyond a reasonable doubt. The evidence is viewed in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict." *United States v. Asibor*, 109 F.3d 1023, 1030 (5th Cir. 1997) (internal citations omitted).

We review the sentencing court's decision to depart downward from the Guidelines under a deferential abuse of discretion standard. *Koon v. United States*, 116 S.Ct. 2035, 2046 (1996). The district court's interpretation of the Guidelines is a question of law that this court reviews *de novo*. *United States v. Clayton*, 172 F.3d 347, 353 (5th Cir. 1999). The sentencing

7

court's factual findings are reviewed for clear error and this court gives due deference to the sentencing court's application of the Guidelines to the facts. 18 U.S.C. § 3742(e)(4).

II. Sufficiency of the Evidence

Harris argues that the evidence was insufficient for the jury to find him guilty of using excessive force in violation of 18 U.S.C. § 242. Both here and in the trial court, the defense's argument has centered on the evidence pertaining to Lopez's injuries. Harris contends that the Government did not prove that the laceration or the hematoma was caused by Harris's striking Lopez with a baton rather than by Lopez's striking his own head against parts of the car. It is not entirely clear whether this is an argument that the Government did not prove that Harris actually hit Lopez in the head or an argument that the Government did not prove that Harris caused any sufficient injury to Lopez. In either case, the argument is ultimately unavailing and we affirm the jury's finding of guilt.

Two witnesses, Lopez and Officer Flynt, testified that they observed Harris strike Lopez in the head. A third witness, Agent Summerlin, testified that Harris admitted striking Lopez in the head. These pieces of direct evidence were corroborated by the circumstantial evidence provided by Officers Trimm and Stacy; Trimm and Stacy each testified that they observed Harris moving about in the car and then observed Lopez bleeding from the head.

8

Drawing all inferences from this evidence in the light most favorable to the verdict, a reasonable jury could find that the Government had proven beyond a reasonable doubt that Harris struck Lopez in the head with the baton.

To find that Harris used excessive force in violation of Lopez's rights under the Fourth Amendment, it was not necessary for the jury to find that Lopez had suffered "significant injury." *United States v. Sanchez*, 74 F.3d 562, 565 (5th Cir.1996). Officers Flynt and Trimm both testified that, in their experience, hitting Lopez in the head with the baton would have been excessive under the circumstances. The defense's own witness, Pounders, expressed the same opinion based on his military training in the use of restraining force. Officer Stacy testified that Harris could have better controlled Lopez by waiting until the other officers came over to help Harris restrain him. However, the particular crime charged in the indictment required "bodily injury" *or* "the use, attempted use, or threatened use of a dangerous weapon." 18 U.S.C. § 242 (providing for a maximum term of imprisonment of ten years if either of these factors is present). The trial court's instructions to the jury correctly described this element of the crime. It is undisputed that Harris used a police baton during the incident and the jury could rationally find that this was a "dangerous weapon." *See Koon*, 116 S.Ct. at 2048 (noting that the

9

district court had regarded a police baton as a "dangerous weapon" for purposes of applying the Sentencing Guidelines); *cf. United States v. Estrada-Fernandez*, 150 F.3d 491, 497 (5th Cir.1998) (determination whether an object is a "dangerous weapon" is a jury question and relevant factors include the circumstances under which the object is used); *United States v. Park*, 988 F.2d 107, 109-110 (11th Cir.), *cert. denied*, 114 S.Ct. 226 (1993) (metal pipe swung in a threatening manner found to be a "dangerous weapon.").

Because there was sufficient evidence that Harris used a "dangerous weapon" in committing the assault, we can affirm this conviction under section 242 without deciding whether the Government proved that Harris had caused "bodily injury" to Lopez or the scope of "bodily injury" as used in section 242.[6]  The

---

[6]Arguably, the trial testimony gives equal or nearly equal circumstantial support to the theory that Lopez's head laceration and hematoma were caused by Lopez's banging his head against surfaces in the car rather than by Harris's striking Lopez. *Cf. United States v. Lopez*, 74 F.3d 575, 577 (5th Cir.1996) (conviction must be reversed if evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence."); *United States v. Reveles*, 190 F.3d 678, 686 (5th Cir. 1999) (same).  We also note, however, that the instructions to the jury, as to which Harris has raised no complaint on appeal, state in relevant part:

> "The Government must also prove that the defendant's acts either resulted in some bodily injury or involved the use of a dangerous weapon.  In order to prove that the defendant's acts resulted in bodily injury, the Government need not prove that the defendant intended to cause bodily injury to the victim, but only to prove that bodily injury, *no matter how slight*, did result from the defendant's alleged assault on Gerardo [sic] Lopez.  Bodily injury would *include* a cut or bruise or *physical pain*."  (emphasis added).

10

jury was presented with sufficient evidence to conclude that Harris struck Lopez in the head with a dangerous weapon, the police baton, and that this action constituted excessive force under the circumstances.  These elements are sufficient to sustain Harris's conviction under Section 242.

III. The Decision to Depart Downward

The Government argues that the district court's downward departure from the Sentencing Guidelines was unauthorized and that, if a departure were authorized, a departure down to thirteen months' imprisonment was unreasonably large.

We review a district court's departure from the range established by the Guidelines for abuse of discretion.  *Koon v. United States*, 116 S.Ct. 2035, 2046-47 (1996).  The district court's decision is accorded substantial deference because it is a fact intensive assessment and the district court's findings of fact are reviewed for clear error.  *Id.*  However, the district court's interpretation of the Guidelines is a question of law, reviewed *de novo*; a district court abuses its discretion by definition when it makes an error of law.  *Id.* at 2047.

---

Under this definition, the evidence was clearly sufficient to show bodily injury.  We are satisfied that if there were any error in this aspect of the instructions (a matter we do not decide) it was not clear or plain error. *See United States v. Myers*, 972 F.2d 1566, 1572 (11th Cir.1992), *cert. denied*, 113 S.Ct. 1813 (1993) (approving instructions that "bodily injury" under section 242 "means any injury to the body, no matter how temporary . . . also includes physical pain as well as any . . . abrasion").

11

Determining whether a factor is permissible to take into account when considering a departure is one of these questions of law. *Id.* A district court abuses its discretion if it departs on the basis of legally unacceptable reasons or if the degree of the departure is unreasonable. *United States v. Nevels*, 160 F. 3d 226, 230 (5th Cir. 1998).

We now address the district court's decision that a downward departure was warranted. We distinguish this inquiry from the separate question of whether the extent of the departure was reasonable. In reviewing the decision to depart downward, the judges of this panel are not called upon to decide whether, had we presided at trial and sentencing, we would have drawn the same inferences from the evidence or made the same factual findings as did the district court. All we are called upon to decide is whether that court's view of the evidence and its findings are clearly erroneous. Nor are we called upon to decide whether, accepting the district court's findings, we would have exercised our discretion to depart from the guideline range. All we are called upon to decide is whether the district court's decision to depart was on a legally invalid basis and whether that decision was an abuse of the court's discretion.

The Government picks snippets from the court's comments during the sentencing hearing to argue that the district court's departure decision was influenced by possibly improper

12

considerations. After reviewing the transcript from the

sentencing hearing and the court's written Statement of Reasons

for departing, we are satisfied that the district court made it

clear that it relied on U.S. Sentencing Guidelines Manual §

5K2.10 in deciding to depart downward.[7] Therefore, we will apply

_____

[7]The district court's written Statement of Reasons reads, in relevant part:

"The victim in the instant case was not compliant with arresting officers, including the defendant. It is the Court's opinion the victim in the instant case was extremely persistent in his wrongful conduct which significantly provoked the defendant's excessive use of force against the victim. Due to the aforementioned factors, it is the Court's opinion the victim's wrongful conduct contributed significantly to provoking the offense behavior; therefore, a downward departure is made pursuant to U.S.S.G. § 5K2.10."

The district court's oral remarks at sentencing included the following:

". . . pursuant to section 5(k)2.10 the Court finds that the victim's wrongful conduct contributed significantly to provoking the offense behavior, and under that section, the sentence may be reduced below the guideline range to reflect the nature and circumstances of the offense.

In this particular case, the record shows that Mr. Harris , on two occasions, after receiving calls from neighbors in the community asking for him to come up and restore order to the neighborhood as a result of this alleged – of this victim and his friends' loud and raucous parties at night and after going and asking the victim and his friends on two occasions to be quiet, they refused to follow his directions. So then he called for other persons, other law enforcement officers, to come in and help him.

Mr. Harris and the other law enforcement officers went to the house where the victim and his friends were drinking and playing loud music late at night out on the carport and asked them to be quiet and they refused again. So that was the third trip that had been made to this house asking for quiet.

After they refused to be quiet on the third trip, the officers went back again the fourth time and arrested the victim and he was detained by the defendant and was placed in the back of the patrol car.

It was obvious from the testimony that the victim was

13

the review standard described above to the district court's interpretation and application of Section 5K2.10.

Section 5K2.10 is a policy statement explaining that a downward departure is permissible "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior." U.S. Sentencing Guidelines Manual § 5K2.10 (1998). The Government argues that Section 5K2.10 contemplates only victim misconduct that poses actual, or reasonably perceived, physical danger to the defendant. We think this interpretation goes too far afield of the plain language of Section 5K2.10 to be tenable. If the Sentencing Commission had intended such a narrow construction, it could have framed Section 5K2.10 in terms related to the doctrines of sudden emergency, imminent peril,

---

intoxicated, was very intoxicated; that he was irate and he started trying to kick out the inside of the car, kicking at the back seat, the windows and the seats. The testimony revealed that when this was going on, Mr. Harris reached in and hit him on the shins trying to stop that, and then after that happened, the door was shut, the victim started slamming his head against the plexiglass divider between the front seat and the back seat.
    One officer had gone in and sprayed him with pepper spray, and pepper spray in a closed car did not stop the victim from banging around in the back of the car. All attempts to stop this tearing up the back of the car were unsuccessful, and then Mr. Harris did, at that time, commit the crime with which he stands convicted, he hit him in the head with a police baton. . . . it was a backhand blow that did – was a result of disruptive behavior by the victim. It was obviously provoked."
The Presentence Report states, *inter alia*, "it appears the victim's continued disruptive behavior contributed significantly to provoking the offense behavior."

14

self-defense or the like, rather than in the broader terms of "wrongful conduct . . . . provoking the offense behavior." U.S.S.G. § 5K2.10; *cf. Blankenship v. United States*, 159 F.3d 336, 339 (8th Cir. 1998), *cert. denied*, 119 S.Ct. 844 (1999) ("[A] defendant need not prove the elements of a justification defense in order to obtain a downward departure on the basis of the victim's wrongful conduct . . . ."). In *Koon*, the Supreme Court sustained the district court's section 5K2.10 downward departure despite its unassailed finding that at the time of the offense behavior the victim "was no longer resisting arrest. He posed no objective threat, and the defendants had no reasonable perception of danger." *Id.* at 2048. Moreover, "the offense behavior" is an important phrase; it signifies that there is a relationship between the type of offense behavior and the type of victim misconduct that would "contribute[] significantly to provoking" it. Victim misconduct posing a physical danger to the defendant may be necessary to significantly provoke *some* types of offense behavior, but less serious victim misconduct may be sufficient to provoke less violent offense behavior. Section 5K2.10 itself contains the following explanation: "There may . . . be unusual circumstances in which substantial victim misconduct would warrant a reduced penalty in the case of a non-violent offense. For example, an extended course of provocation and harassment might lead a defendant to steal or destroy property in

retaliation." We note that this passage was cited as instructive by the Supreme Court in *Koon*. *Id.* 116 S.Ct. at 2049. There is no necessary connection between offense behavior consisting of a property crime and a requirement that the victim's misconduct pose a physical danger to the defendant. Nor do "provocation and harassment" necessarily imply any physical danger.

Section 5K2.10 does list the following factors that a court should consider "[i]n deciding the *extent* of a sentence reduction" (emphasis added):

"(a) the size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant;

(b) the persistence of the victim's conduct and any efforts by the defendant to prevent confrontation;

(c) the danger reasonably perceived by the defendant, including the victim's reputation for violence;

(d) the danger actually presented to the defendant by the victim; and

(e) any other relevant conduct by the victim that substantially contributed to the danger presented."

Other than (b), these factors do relate to physical danger and the Government references them in support of its interpretation of Section 5K2.10. In response, we note first that these are factors to be considered in determining the *extent* of a downward departure rather than *whether* there should be a downward departure, which is the question we address here. We next observe that these factors will not always be relevant to every

16

type of offense behavior, including some offenses expressly contemplated by Section 5K2.10. As discussed above, Section 5K2.10 explicitly refers to property crimes as a type of offense behavior that a victim might provoke by his misconduct. The misconduct plainly need not be of a kind which poses a threat of physical injury to the defendant. In many cases where the offense behavior is theft or vandalism, such factors as the size and strength of the victim will have little or no relevance. Taken as a whole, Section 5K2.10 evinces a concern that the offense behavior be not excessively disproportionate to the provocation. *See Blankenship*, 159 F.3d at 339.

The cases from our sister circuits that the Government cites in support of its interpretation are in line with our construction. The defendant in *United States v. Paster*, 173 F.3d 206 (3d Cir.1999), had been convicted of murdering his unfaithful wife, and the Court of Appeals affirmed the district court's refusal to depart under Section 5K2.10. The defendant in *United States v. Shortt*, 919 F.2d 1325 (8th Cir.1990), had been convicted of making and possessing a pipe bomb, with which he had apparently been planning to kill his wife's lover, and the Court of Appeals, pre-*Koon*, reversed the Section 5K2.10 departure. In these cases the offense behavior involved the intentional or planned destruction of human life; those courts, understandably, regarded the threat of physical danger as a necessary component

17

for the victim's misconduct to sufficiently mitigate this type of offense conduct.  *See Paster*, 173 F.3d at 212 ("Paster's response was grossly disproportionate to any provocation."); *Shortt*, 919 F.2d at 1328 ("While the District Court is surely correct that 'there's hardly any greater provocation than to have someone having an affair with your spouse[,]' that is not the end of the matter.  The further question remains: provocation for what?" (internal citation omitted)).

The offense behavior here involved Harris's striking Lopez in the head with the baton.[8]  The district court's commentary during the sentencing hearing demonstrates that it was engaging in the proportionality analysis necessary to apply Section 5K2.10.  The court's factual findings that Harris hit Lopez "back-handed", using his forearm, and that Lopez suffered little physical damage are adequately supported by the testimony and are not clearly erroneous.[9]  It was appropriate for the court to take

---

[8]The Government's position throughout has consistently been that it was the blow or blows to Lopez's head that crossed the line  from a lawful use of force to an unlawful one.  The Government does  not dispute that Lopez was lawfully arrested.  When examining the officers and Pounders at trial, the prosecutors elicited testimony to the effect that striking Lopez in the head was an unreasonable use of force under the circumstances, although striking Lopez in the shins or legs probably was not.  Additionally, the Government has laid great stress on the laceration and hematoma present on Lopez's head and has not identified physical injuries on any other part of Lopez's body as being relevant to the prosecution.

[9]The district court stated at sentencing "he hit him back-handed. He didn't raise the baton over his head and come down on him, but he reached into the car and hit him with it back-handed.  Back-handed.

18

these factors into account when doing the proportionality analysis; they are relevant to determining the severity of the blows Harris struck.  A certain degree of victim misconduct may be sufficient to provoke less severe blows but insufficient to provoke more severe blows.  In *Koon*, the victim, Rodney King, was beaten severely, but he had also engaged in severe misconduct and the sentencing court did not abuse its discretion in departing downward pursuant to Section 5K2.10.  *Koon*, 116 S.Ct. at 2049 - 50.  In the instant case, it was necessary for the district court to evaluate the severity of Harris's offense behavior in order to determine whether Lopez's misconduct significantly contributed to provoking that behavior.

*Koon* further teaches that the district court did not abuse its discretion by taking into account the entire course of Lopez's misconduct.  In that case, the district court applied Section 5K2.10 after finding that, although the victim was no longer resisting arrest or posing any danger at the time the defendants' actions crossed the line to unlawful force, the victim's course of misconduct, which included driving while intoxicated, fleeing the police, and initially resisting arrest, was provocative.  *Koon*, 116 S.Ct. at 2048.  In this case there

Because as I understand, that would be using your forearm" and "there was not very much damage done to this victim at all."

19

was a similarly extended course of provocative misconduct.[10]
Lopez admits that he became intoxicated during the course of his
participation in a raucous party.  Harris visited the house where
the party was in progress three times -- twice by himself, once
accompanied by other officers -- to warn the partygoers to be
quiet before returning the fourth time to begin making arrests.[11]
Every eyewitness, including Lopez, agrees that Lopez persisted in
thrashing around violently in the car, threatening to damage both
the vehicle and himself.  Lopez kicked Harris and Officer Trimm
when they attempted to subdue him and he persisted even after
Trimm sprayed him with pepper spray.[12]  Although there was

---

[10]We do not, in any way, equate the *severity* of Lopez's misconduct
with that of the victim in *Koon*.  We reiterate that Section 5K2.10 is
concerned with proportionality.  Rodney King's misconduct was severe and
created a serious risk of injury to others.  His attackers beat him
severely and repeatedly, leaving him with multiple fractures and
numerous contusions.  *Koon*, 116 S.Ct. at 2041.  In the instant case,
Lopez's misconduct was far less severe and so was his victimization.
The district court, in a finding supported by the medical evidence,
inferred that Lopez was not severely injured by Harris's blows.

[11]There is no indication in the record – and there was no finding
by the district court – that Lopez, as compared to other attendees, was
particularly culpable for the disruptive nature of the party.  Lopez was
not on trial here and this sentencing hearing could have no effect on
his rights.  Part of the focus in the Section 5K2.10 inquiry must be on
the defendant's state of mind.  By the plain language of the section,
the defendant must have actually been provoked.  From the fact that
Harris had been required to visit the house three times asking for
quiet, the district court could reasonably infer that Harris was in an
agitated state of mind, and more susceptible to provocation, by the time
he arrested Lopez.

[12]It appears from the testimony that Trimm did not spray Lopez and
Lopez did not kick Trimm until *after* Harris had hit Lopez in the head.
If this was the case, then it cannot be said that Lopez's kicking Trimm

20

testimony that Lopez initially submitted to being arrested and handcuffed, Lopez pleaded guilty to resisting arrest and the district court was entitled to take this fact into account in evaluating Lopez's misconduct.

The district court also took note of Harris's unblemished record as a police officer.  A defendant's "[e]mployment record is not *ordinarily* relevant in determining whether a sentence should be outside the applicable guideline range."  U.S.S.G. § 5H1.5 (emphasis added).  But, in this case, Harris's record was relevant to whether Lopez provoked the offense behavior.  A record of excessive force complaints might indicate that an officer is inclined to use unlawful force absent any provocation; an unblemished record may indicate the opposite inclination.  The district court did not abuse its discretion by taking this factor into account.  *Cf. Koon*, 116 S.Ct. at 2046 - 47 (district court's special vantage point informs its refined assessment of whether the case before it is unusual).

---

provoked Harris's bad act.  However, the testimony did not make the precise sequence of events entirely clear.  Trimm testified that he never saw Harris hit Lopez but that Lopez was bleeding from the head before Trimm sprayed him.  Pounders testified that Trimm stepped in between Lopez and Harris  after Harris had struck one blow toward Lopez's feet and while Lopez was still kicking in Harris's direction. Officer Stacy testified that he never saw Trimm spray Lopez, but that, when Stacy intervened to stop Harris's assault on Lopez, Stacy could smell that Lopez had already been "maced."  Even if the pepper spray and Lopez's kicking Trimm did not occur until after Harris struck Lopez in the head, Lopez's persistence after being sprayed with pepper spray may be indicative of how violently out of control he was during the course of the incident.

In light of the factors described above, the district court found that this case was different from the typical case contemplated by the Sentencing Guidelines, in which the victim had done nothing to provoke an officer's use of unlawful force. The Supreme Court has explained why such a finding was not an abuse of the district court's discretion:

> "The [*Koon*] Court of Appeals misinterpreted the heartland of § 2H1.4 by concentrating on whether King's misconduct made this an unusual case of excessive force. If § 2H1.4 covered punishment only for excessive force cases, it might well be a close question whether victim misconduct of this kind would be sufficient to take the case out of the heartland. Section 2H1.4 is not so designed, however. It incorporates the Guideline for the underlying offense, here § 2A2.2 for aggravated assault, and thus creates a Guideline range and a heartland for aggravated assault committed under color of law. As the District Court was correct to point out, the same Guideline range applies both to a Government official who assaults a citizen without provocation as well as instances like this where what begins as legitimate force becomes excessive. The District Court did not abuse its discretion in differentiating between the classes of cases, nor did it do so in concluding that unprovoked assaults constitute the relevant heartland.  Victim misconduct is an encouraged ground for departure. A district court, without question, would have had discretion to conclude that victim misconduct could take an aggravated assault case outside the heartland of § 2A2.2."  *Koon*, 116 at 2049 - 50.

In sum, the record does not establish that the district court based its decision that a downward departure was warranted on impermissible factors or that it abused its discretion in deciding to depart downward pursuant to Section 5K2.10.

IV.  Extent of Departure

22

For the reasons stated in the separate opinion of Judge Wiener, concurred in by Judge Vance, a majority of the panel concludes that the extent of the departure has not been adequately justified on the record as reasonable, and that accordingly the sentence must be vacated and the cause remanded for resentencing.

## Conclusion

Because there was sufficient evidence to convict Harris, we AFFIRM the conviction. Because the district court did not err in law or abuse its discretion in deciding to depart downward, we AFFIRM the district court's decision to depart. However, for the reasons stated in the separate opinion by Judge Wiener, concurred in by Judge Vance, this court VACATES the sentence imposed by the district court and REMANDS the case for resentencing.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

ENDRECORD

WIENER, Circuit Judge, joined by VANCE, District Judge, specially concurring:

Having concluded as a unanimous panel that the record contains sufficient evidence to support Harris's conviction and that the district court's decision to depart downwardly evinced no abuse of discretion, we now address the extent of the court's downward departure.  Based on (1) the several factors that the district court should have considered but did not, (2) the pervasiveness of overt ethnic animus displayed by Defendant-Appellant Harris before, during, and after his assault on Lopez, and (3) other facts included in the PSR, Judge Vance and I conclude –– and Judge Garwood disagrees, as evidenced by his dissent that follows –– that the district court abused its discretion when it departed downwardly to such an extent that the sentence it imposed equaled only 15 % of the Guidelines minimum for the offense of conviction.

## I.  ANALYSIS

### A.  Standard of Review

When it comes to downward departures at sentencing, we afford broad discretion to the district court.[13]  No abuse of that discretion exists "if the judge provides acceptable reasons for the [downward] departure and the degree of departure is

---

[13]  Koon v. United States, 518 U.S. 81 (1996); United States v. Alvarez, 51 F.3d 36, 41 (5th Cir. 1995).

reasonable."[14]  We reiterate that we find no abuse of discretion in the court's decision to depart downwardly;  our concern here is solely with the reasonableness of the extent of a departure that we perceive to have resulted from a sentencing court's analysis that was neither complete nor balanced.

## B.  Factual Background

We adopt the version of the facts included in Judge Garwood's thoughtful opinion, but we supplement it with the crucial testimony regarding Harris's ethnic animus.  True, discriminatory animus was not alleged in the indictment, so it cannot be said that his conviction resulted from a jury finding beyond a reasonable doubt that Harris's actions were motivated by such animus.  Nevertheless, his ethnically derogatory assertions, of which there is a plethora of evidence in the record and the PSR,[15] remain relevant to his sentencing.  Even though it was not charged or proved that his actions were driven by ethnic animus, no picture of this case is complete without inclusion of Harris's

---

[14]  United States v. Nevels, 160 F.3d 226, 229-30 (5th Cir. 1998) (emphasis added).

[15]    As detailed by the Probation Officer in the PSR, Harris repeatedly made derogatory comments regarding Mexicans before, during, and after the incident leading to his arrest. For example, (1) when calling for backup, he advised the dispatcher to tell the deputies to bring their nightsticks because a "bunch of wetbacks" were having a party; (2) Harris told the EMT Officer on arrival that he (Harris) had knocked the "shit" out of Lopez and that Mexicans were not going to take over the town; (3) during an investigative interview with the FBI after the incident, Harris told the FBI that Mexicans did not have the same rights as "real Americans" and asked the FBI to help get the "damn" Mexicans out of his town.

extensive, ethnically bigoted statements.  More to our point, despite Harris's anti-Mexican epithets being well documented in the PSR and in the record, the district court did not so much as mention these statements or this factor in its departure explication.

As noted in Judge Garwood's opinion for our panel, the sequence of facts is not completely free from ambiguity because differing versions appear in the PSR, one detailed and the other abbreviated.  In its <u>detailed</u> recitation of the Offense Conduct, the PSR lists the facts in the sequence the panel credits; in its <u>abbreviated</u> summary of the facts, in the section entitled "Factors That May Warrant Departure," however, the PSR lists (mistakenly, perhaps out of haste) the facts in a slightly different sequence. We continue to employ the sequence set forth in Judge Garwood's opinion, noting in particular that Officer Trimm did not pepper spray Lopez, and that Lopez did not kick Officer Trimm, until <u>after</u> Harris had clubbed Lopez in the head.[16]

During sentencing, the district court apparently failed to recognize this internal inconsistency in the PSR and relied on the summarized sequence of facts.  Unfortunately, this resulted in the court's short-circuiting of the government's attempt to

---

[16] <u>See</u> Judge Garwood's opinion, Facts and Proceedings and note 12.

object to that version.[17]  Again, it is the more complete and accurate version of the facts that appears in the lengthy, detailed portion of the PSR and in Judge Garwood's opinion.

## C. **Reasonableness of the Extent of Departure**

We do not take the position that the extent of the downward departure is per se unreasonable.  At the very least, however, a departure resulting in an 85%, 16 level reduction below the applicable guideline range has to be a red flag to any reviewing court, provoking at a minimum an inquiry into the reasonableness of so extensive a departure.  And, when all the circumstances and facts in the record of this case are exposed to the sunlight, the

---

[17] During the sentencing hearing, in response to the court's query regarding the PSR, the government answered "[t]here are two misstatements arising in the presentence report, one particularly goes to victim provocation.  Those have come out since our earlier day, as we received the trial transcipt...[referring the fact the Trimm was kicked after Harris's actions]...That wouldn't constitute provocation for Mr. Harris's action."  That answer prompted the following colloquy with the court:

**Court:** ...Did you file any objection to the factual statements contained in the presentence report 10 days before trial, before sentencing?

**[Government]**: No, Your Honor.  Those arose when we received the trial transcript and had the opportunity to - -

**Court**:  So those objections are untimely.  There are no objections to the factual statements filed with the Court in accordance with the Court's rules - -

**Government:** Excuse me, Your Honor.  We did actually state the objection — we did note the problem with Mr. Trimm's testimony in our papers.

**Court**:  Well, did you do it in the form of an objection?

**Government:** No, Your Honor.

....

**Court**:  There are no objections filed to the factual statements contained in the presentence investigative report so the Court adopts those as its findings of fact.

27

degree of the district court's departure, based as it was almost entirely on victim provocation, is undeniably disproportionate to that provocation.

During sentencing, the district court stated:

> One of the elements that the guidelines called to be considered in deciding the extent of a sentence reduction under 5(k) [sic] 2.10 is the persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.  Well, if there's ever been a persistent victim who egged a situation on and continued, after being given every opportunity to stop his provoking conduct, then this victim had.

The court is only partially correct: The persistence of the victim's conduct is <u>a</u> factor to be considered under 5K2.10.  It certainly is not, however, the <u>only</u> factor to consider under 5K2.10.    In relevant part, 5K2.10 reads:

> In deciding the <u>extent</u> of a sentence reduction, the court <u>should</u> consider:
> (a) the size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant;
> (b) the persistence of the victim's conduct and any efforts by the defendant to prevent confrontation;
> (c) the danger reasonably perceived by the defendant, including the victim's reputation for violence;
> (d) the danger actually presented <u>to the defendant</u> by the victim; and
> (e) any other relevant conduct by the victim that substantially contributed to the danger presented.[18]

Our review of the sentencing transcript confirms that the district court focused solely on the second factor, factor (b),

---

[18]  U.S.S.G. § 5K2.10 (emphasis added).

to the total exclusion of all others. Even though we do not insist that a sentencing court engage in a talismanic incantation of each listed factor, the sentencer's focusing exclusively on but one factor to the complete disregard of all others is a substantial first step on the road to abuse of discretion.

Under the first 5K2.10 factor, the sentencing court should compare the size and strength of the victim to those of the defendant.[19] Harris is 6'2" and 325 lbs.; in contrast, Lopez is approximately 5 feet tall and weighed, at most, 140 lbs —— more than a foot shorter than Harris and less than half his weight.

Regarding the third and fourth factors under § 5K2.10, we note that, at the time the offense occurred —— which was <u>after</u> the victim had been arrested on a public drunkenness charge —— Lopez was already handcuffed and in police custody, having been locked in the caged rear compartment of the patrol car. The fourth factor expressly instructs the sentencing court to consider the <u>actual</u> danger presented <u>to the defendant</u>. Having been restrained and confined (and being unarmed and much smaller than Harris), Lopez was at most a danger to himself (when he was banging his head) and to property (when he was thrashing about and kicking the police car).[20] But, importantly, Lopez was never

---

[19]   <u>See</u>, <u>e.g.</u>, <u>United States v. Yellow Earrings</u>, 891 F.2d 650, 653–54 (8th Cir. 1989)(noting all five factors and discussing the relative size and strength of the victim and defendant).

[20]   <u>Cf</u>. <u>United States v. Paster</u>, 173 F.3d 206 (3d Cir. 1999) (denying a 5K2.10 departure on the grounds that, although the victim's

a danger <u>to the public</u> and was not a danger <u>to Harris</u> until after Harris returned to the  patrol car and opened its door.[21]  And, even at that point, given the handcuffs restraining Lopez and Harris's size and the weapons he possessed, it is far from certain that Lopez ever presented an actual danger to Harris.

Neither is there any indication in the record or the PSR that Lopez had a reputation for violence or that Harris believed or suspected that Lopez had any such propensity.  Moreover, both the PSR and Judge Garwood's opinion confirm that Harris's return to the vehicle —— well after Lopez was in custody and subdued —— was all about Harris's anger at the situation and his loss of "composure as a law enforcement officer."[22]

Finally, even the one § 5K2.10 factor that the district court did discuss —— the second factor, persistence of

---

comments to the defendant about her affairs with other men and her ability to contact people with weapons were inflammatory, these actions by the victim did not present danger or reasonable perception of danger <u>to the defendant</u>).

[21]  We note at this juncture that the district court referred repeatedly to the fact that Harris's blow was a backhanded blow which did not cause serious damage to Lopez.  If the district court considers the actual danger or damage to Lopez, it should also factor in the actual danger to Harris.

[22]  The Presentence Report (and Judge Garwood's opinion at 5) describes Harris's excessive behavior and apparent state of mind.  Specifically, both document that other officers were procuring an alternative, non-violent, method of restraining Lopez and told Harris that they were doing so when Harris opened the door and began striking Lopez.  Officer Stacy testified that he stopped Harris from hitting Lopez because Harris had "lost his composure as a law enforcement officer."

provocative conduct and avoidance of confrontation —— is not discussed completely. Our review of the detailed version of the facts that the sentencing court should have used reveals that it relied on a sequence of events that is not logically applicable to support its finding that Lopez's conduct was persistent and contributed significantly to Harris's behavior. According to the summary version of the facts presented of the PSR, Harris hit Lopez on the head with the baton (the offense behavior) <u>after</u> Lopez had thrashed about in the car and <u>after</u> Lopez had kicked Trimm and received the pepper spray.[23] In the credited version of the facts, which accords with trial testimony and the detailed portions of the PSR, the only provocative behavior contributing significantly to Harris's conduct was Lopez's thrashing about in the car and banging of his own head on the plexiglass. As Harris hit Lopez on the head <u>before</u> Lopez kicked Trimm, Lopez's kicking of Trimm could not have contributed to the provoking of Harris's behavior (and may have actually been a fearful response by Lopez to being hit in the head). Applying the version of the facts presented by the government and by the unanimous panel opinion, some of Lopez's most significant behavior could not have possibly contributed to provoking Harris's conduct because they simply had not yet occurred.

Including in the sentencing calculus the number of times

---

[23] PSR ¶ 59, "Part E: Factors that May Warrant Departure."

that the officers returned to the party as part of Lopez's persistent behavior also defies logic. The behavior of a collective group of partygoers, necessitating repeated visits by police officers, cannot reasonably be laid entirely at the feet of but one of the party's attendees and then be treated as though the group's collective "persistent provocative behavior" was his alone.

In addition, the record evidence confirms that Harris made no effort whatsoever to avoid or prevent a confrontation. To the contrary, he initiated it. The PSR indicates that Officer Stacy advised Harris that he (Stacy) was going to his vehicle to obtain a device that they could use to restrain Lopez's feet. Instead of consulting with or waiting for Officer Stacy, Harris proceeded to the squad car, opened its door, and began striking Lopez with the baton.

Neither is this case so extraordinary as to eviscerate the Guidelines of all applicability. Even if the circumstances militate against assessing the full Guideline's recommendation of nine years and militate in favor of a downward departure, the imposition of a prison term equal to only one-seventh of the minimum Guideline sentence would require strikingly different circumstances than those that are presented by this case. Neither the Guidelines nor precedent give us firm guidance as to precisely what constitutes a "reasonable" departure, but our search of the case law produced not a single case with a

departure nearly as extensive as the one granted to Harris, either in percentage or number of offense levels.

In Koon, the Rodney King criminal case, the Supreme Court did not expressly rule on the "reasonableness" of the departure but did approve, based on the abuse of discretion standard, the district court's downward departure of 5 levels pursuant to 5K2.10 (the same victim provocation grounds that the district court articulated for its departure here). The victim's conduct in that case (high speed drunk driving; endangering lives in a car chase; continued and possibly dangerous resistance to arrest) was far more provocative and egregious than Lopez's (thrashing about in the back seat of a police car after being restrained and confined; hitting his own head against a plexiglass barrier while restrained; kicking at police officers when they opened the door). Yet the number of offense levels by which the district court departed in assessing Harris's sentence is almost three times the number by which the sentencing court departed downwardly in Koon.[24]

In Yellow Earrings,[25] the Eighth Circuit affirmed a downward departure pursuant to 5K2.10, approving a sentence of 15 months, and a departure of 8 offense levels, even though the Guidelines

---

[24] We concede that the officers' conduct in Koon was more egregious than the officer's behavior in this case. Even given the limited value of the comparison to Koon, however, the level of departure in that case is instructive.

[25] 891 F.2d 650.

33

range for the offense level of 22 was 41 to 51 months (15 months represents a 63% departure from the minimum guideline sentence of 41 months).[26]  In Yellow Earrings, where the provoked defendant (a woman) was standing trial for stabbing the "victim" (the man who provoked her), the court noted that the victim (1) had publically humiliated the defendant, (2) had attempted to force her to engage in sexual intercourse, (3) was known to be violent when under the influence of alcohol, (4) was bigger and stronger than the female defendant, and (5) had the advantage of being in his own private residence at the time of the incident.[27]  Like King's, this conduct was much more provocative than was that of Lopez in the instant case.

The sentencer here should also have considered the fact that police are often called to disrupt loud parties; and frequently, as for example with college fraternity parties, police must make repeated trips to the scene before the noise level is reduced sufficiently and permanently.  The inclusion of Lopez's participation in a raucous party as part of his extended course of provocative conduct skews any comparison to Rodney King's conduct.  Put simply, we fail to see how Lopez's participation as one of many Mexican-American partygoers at a Cinco de Mayo party can reasonably be included in the calculus for finding conduct

_____

[26]  Id. at 652.

[27]  In Yellow Earrings, however, the defendant was not a police officer, as is the case here.

34

that "contributed significantly to provoking the offense behavior," as required by 5K2.10. There is no indication that Lopez was anything other than one of many revelers who together made repeated police visits necessary.

Furthermore, as Judge Garwood's opinion for our panel notes, even though Lopez eventually pleaded guilty to a single count of resisting arrest, he initially submitted, calmly and without incident, to being arrested, handcuffed, and placed in the squad car. All reasonably related provocative actions occurred after Lopez's was handcuffed and confined in a police car.[28] As we stated in United States v. Clayton, "[w]e think that an underlying consideration in applying the guideline [§ 3A1.3] is that the physical restraint of a victim during an assault is an aggravating factor that intensifies the wilfulness, the inexcusableness and reprehensibleness of the crime and hence increases the culpability of the defendant."[29] Here, in departing so extensively, the district court appears to have ignored the wilfulness and heightened culpability of defendant Harris.

Given (1) the enhancement of Harris's sentence for striking the restrained victim, (2) the non-extraordinary nature of the

---

[28] In arriving at Harris's offense level of 29, the court added a 2-point enhancement pursuant to § 3A1.3 because Lopez was physically restrained at the time of the offense.

[29] 172 F.3d 347, 353 (5th Cir. 1999).

case, and (3) the sentencing court's single-pointed focus on but one of the five listed factors of 5K2.10, we conclude that departing downwardly 85% is an abuse of discretion, necessitating a remand for resentencing.

Nevertheless, even if the foregoing reasons (which alone satisfy us that vacatur is mandated) were not deemed sufficient to warrant vacatur, the additional contextual factors detailed in the record —— (1) Harris's personal history and (2) his extreme ethnic animus —— push the extent of this departure well beyond the borders of reasonableness.  First, as we are here dealing with the conduct of a police officer in the course of his official duties, consideration of Harris's employment record may be relevant despite the policy statement in U.S.S.G. § 5H1.5 to the contrary.[30]  Even so, the district court's mention of Harris's employment record and the letters of community support —— to the complete exclusion of the other relevant personal history facts in the PSR —— contributes to the conclusion that discretion was abused.  Albeit unscoreable for CHC purposes, one example of a relevant matter left unaddressed by the district court is Harris's 1975 guilty plea in state court to a charge of harassment by telephone.  Another example is his having been

---

[30]  U.S.S.G. § 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.").  Also, Harris's clean employment record is partly accounted for in holding down his criminal history category ("CHC") score of I.

36

arrested and charged with disturbance or assault in 1993 (which charges were admittedly dropped eventually by the complainant). A third example is not the fact that Harris was twice married and twice divorced, but that both divorce decrees specified that Harris was abusive, violent, and cruel to his spouses.

Finally, judging from the sentencing transcript and Judge Garwood's opinion for our unanimous panel, the district court failed totally to consider two additional factors, both related to Harris's ethnic animus. First, the record shows that in his conversation with FBI agents during that agency's investigation some nine months _after_ the incident took place, Harris expressed his belief that Mexicans do not have the same rights as "real Americans" and stated that if the same situation were presented again, he would again strike Lopez. An 85% percent departure from the minimum guideline sentence does not adequately punish an openly bigoted Caucasian defendant who shows no remorse for assaulting an Hispanic victim, especially one who literally heralds his own recidivist potential.

Second, the PSR, the trial testimony, and the government's brief detail multiple instances during which Harris made known his hatred for Mexicans or Mexican Americans, his unrepentant beliefs about the relative rights of Mexican Americans, and his continued belief in the correctness of his actions.[31]  Even

---

[31]  See _supra_ note 3.

though Harris was never indicted for or convicted of assaulting Lopez because of ethnic animus, the court's excluding this evidence from its sentencing colloquy omits the larger point that Harris's documented comments regarding Mexicans before, during, and after his assault on a handcuffed Mexican arrestee is relevant conduct for sentencing purposes. Although it is generally within the district court's discretion to designate what it considers to be relevant conduct, in this case, the court's exclusion of a continuous pattern of overt bigotry from Harris's relevant conduct produces a miscarriage of justice. Completely ignoring Harris's ethnically intolerant attitudes and confirmatory statements obscures the true and complete picture of all that took place on that night. Without addressing these facts, the district court could not take an accurate measure of the true extent of Harris's culpability.

We remain ever mindful of the discretion afforded to the district court in sentencing matters. Nonetheless, we cannot accept that, under all these circumstances, the sentencer's skewing of the § 5K2.10 analysis through, inter alia, the total disregard of Harris's ethnic animosity is a reasonable exercise of discretion. As a result, the extent of the court's downward departure too is unreasonable. We therefore vacate the extent of that departure (and thus Harris's sentence) and remand the case to the district court with instructions to resentence Harris after giving due consideration to all aspects of the multi-factor

analysis required by the Guidelines, including, in the process, reconsideration all § 5K2.10 factors, in a manner consistent with this opinion.

## II.  CONCLUSION

For the foregoing reasons, we affirm Harris's conviction and the district court's decision to depart downwardly, but we hold the extent or degree of the departure not to be reasonable.  This in turn mandates that we vacate Harris's sentence and remand to the district court for resentencing consistent with this opinion. Conviction AFFIRMED; sentence VACATED; case REMANDED for resentencing, with instructions.

ENDRECORD

GARWOOD, Circuit Judge, dissenting in part.


I respectfully dissent from the holding that the extent of the departure was excessive. In my view, the majority pays inadequate deference to the district court's role as arbiter of the facts and to its "almost complete discretion" in fixing the extent of a departure.[32]

The majority's primary emphasis seems to be on its conclusion that Harris is a bigoted Caucasian prejudiced against Mexicans, a conclusion which can reasonably be drawn from three different sets of remarks by Harris (as described in the majority's footnote 3). However, the majority concedes that "it was not charged *or proved* that his actions were driven by ethnic animus" (emphasis added), and it is clear to me that the district court considered and rejected any such hypothesis. The court stated, obviously in rejection of the Government's argument that Harris's racial animus played a role in the offense, in relevant part as follows:

"All attempts to stop this tearing up the back of the

---

[32]*United States v. Alvarez*, 51 F.3d 36, 41 (5th Cir. 1995). *See also, e.g., United States v. Cooper*, 274 F.3d 230, 248 (5th Cir. 2001); *United States v. Hashimoto*, 193 F.3d 840, 843 (5th Cir. 1999).

40

car were unsuccessful, and then Mr. Harris did, at that time, commit the crime with which he stands convicted, he hit him in the head with a police baton . . . *it was* a back-hand blow that did—was a *result of disruptive behavior by the victim*. It was obviously provoked. *The Government argues in its brief—I think it's preposterous to argue that Mr. Harris had the intent and the plan to start beating people up before he ever went over to the house*. It's obvious that he did not hit anybody until after the fourth trip and the victim started trying to kick out the back of the car. So it's obvious to the Court that these acts by the victim were inescapably provocation of what happened to him by Mr. Harris. . . . [Lopez] was trying to harm himself and to kick out the back of the car. *Mr. Harris lost his temper*. He shouldn't have done it, but he did not do something that was likely to injure him severely or kill him." (emphasis added)

Moreover, there is no evidence that Harris (who had been in law enforcement over twenty years) on any other occasion ever took or attempted any ethnic, racial or other discriminatory action in either an official or a private capacity. In these circumstances, since the district court plainly concluded, based on adequate evidence, that the offense behavior arose solely because Harris "lost his temper" as a result of Lopez's provocation, and did not arise from racial animus, further consideration of Harris's ethnic prejudice was not required and the evidence of this does not justify the conclusion that the extent of the departure constituted an abuse of the district court's discretion.[33]

---

[33]Of course, that the offense for which a defendant is sentenced was motivated by racial animus is generally a proper factor to consider in sentencing at a higher end of an otherwise permissible range (or as a factor enhancing the range), *Wisconsin v. Mitchell*, 113 S.Ct. 2194

The other major underpinning of the majority opinion on the extent of departure issue is that factors (a), (c) , (d) and (e) of Guidelines section 5K2.10 cut against, not in favor of, a large downward departure.  But, these factors simply are not relevant–and do not speak to–a situation, such as that here, where the valid decision to depart is taken on the basis that the victim's wrongful conduct was provocative of (and provoked) the offense behavior *for reasons unrelated* to any physical danger (actual or reasonably perceived) thereby posed to the person of the defendant (or another).  The sentencing court should obviously consider the extent to which the offense behavior is disproportionate to the provocation.[34]  Plainly the court did so here.  It found that the offense behavior was that Harris "reached into the car and hit him [in the head] with it [the baton] back-handed," "using [his] forearm;" that Harris "didn't raise the baton over his head and come down on him;" that "there was not very much damage done to this victim at all;" and that Harris "did not do something that was likely to injure him [Lopez] severely."  In other words, while the force used by Harris was excessive it was not so to a large extent or degree;

---

(1993), "[b]ut it is equally true that a defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing judge."  *Id*. at 2200.

[34]It will almost always be *somewhat* disproportionate to the provocation in that sentencing only deals with provocation which does *not* legally excuse or justify the offense.

nor was there significant harm to the victim.

As to the provocation, the majority faults the district court for considering in that regard the continuation of the noisy, raucous party (at least partly going on in the carport and front yard of the house) after three prior requests by Harris, as a police officer, to keep it quiet and warning of arrest if that was not done. Clearly this was relevant to Harris's state of mind as being "provoked." Moreover, Lopez admittedly was at the party and drank alcoholic beverages there and he was concededly *very* drunk when the officers arrived the fourth time. That is not to say, and the district court did not say, that Lopez would have sufficiently engaged in "wrongful conduct" for purposes of section 5K2.10 had he behaved after being placed in Harris's car. But he did not. He started wildly kicking at the windows and the interior of the car, thrashing about and the like, and persisted in doing so despite efforts to stop him. I can see no impropriety in considering the entire course of conduct in respect to the matter of provocation under section 5K2.10. Certainly that is a matter within the district court's discretion. Any other approach would be wholly unrealistic.

Moreover, the district court could properly conclude that: after putting Lopez in his car, Harris walked away and only returned when Lopez began his violent kicking and thrashing about; on returning to the car Harris opened the door, Lopez

43

kicked at Harris, Harris told Lopez to stop kicking him, and Harris then struck Lopez in the shins with the baton; Lopez apparently stopped kicking and Harris closed the door and walked away; but Lopez then resumed thrashing about the car and started banging his head against the plexiglass divider; Harris then again returned to the car, opened the door and struck Lopez with the baton, apparently first on the legs[35] and, as Lopez continued to thrash about, then on the head (back-handed).[36]

---

[35]The district court plainly did not, and under the evidence was not required to, find that any of the blows to the shins or legs constituted excessive or illegal force or the offense behavior.

[36]The majority suggests (its note 10) that Harris knew other officers were procuring an alternative, nonviolent method of restraining Lopez. The only evidence in this regard is the testimony of Sheriff's Officer Stacy that sometime after Lopez started kicking in the car, he [Stacy] commented "he [Lopez] could possibly hurt himself or kick a window out of the car" and that "I informed the other officers that I had a hobble . . . in the [Stacy's] car" and that he then "proceeded back to my car to get a hobble." Stacy further stated that when he made the comment about having a hobble in his car, Harris was standing near Harris's car and "was close enough to hear" Stacy. Just how long it took Stacy to return from his hobble trip is not clear. It appears that when Stacy returned Harris had for the second time opened the door and commenced striking Lopez. Stacy never testified that Harris or any other person present ever did or said anything indicating that they heard what Stacy had said about the hobble or ever knew he had one, nor does any other evidence so indicate. None of the other witnesses mentioned anything about a "hobble" (or similar device) or that Stacy had said he was going to get a restraining device. When Flynt was asked what Harris could have done to restrain Lopez, he replied "you can put seatbelts on them, restrain their feet;" but he did not mention that Stacy had, or was going to get, a restraining device. Trimm unsuccessfully attempted to restrain Lopez with mace (Lopez kicked him in the groin).

I also note that there is evidence of prior "bad blood" between Harris and some of the sheriff's officers, and the district court commented on this at sentencing stating "they testified in such a way that it appears to the Court that there was some disagreements they had with this defendant before."

44

The permissible view of the evidence, taken by the district court, can be summarized as follows: that Harris, having tried to stop Lopez's violent kicking and banging about in the car (which was clearly a danger to both the car and Lopez) by hitting him in the legs with his baton in a manner which was not illegal or excessive, and having done so again when, after Harris closed the door, Lopez recommenced that behavior, Harris simply lost his temper, obviously frayed by the entire sequence of events that evening, and crossed the sometimes cloudy or wavering line between reasonable and excessive force by striking Lopez in the head with a back-handed movement from within the car, not a hard swing or blow nor one likely to injure Lopez severely, which resulted in no serious injury nor very much damage to Lopez.

The point of this dissent is not that the writer would-or would not-view the evidence just as did the district court, or draw the same inferences from it, or, if the writer had elected to depart, would-or would not-in the exercise of discretion depart to the extent the district court did.  The point is, rather, that we should view the record facts before us in the light most favorable to the district court's sentencing decision, except as one can properly say that such a view would be clearly erroneous, and, that we should determine only whether, on the basis of such facts, the extent of the departure can fairly be characterized as an abuse of the district court's "almost

45

complete discretion." On the facts so viewed I can find no such abuse of discretion.[37]

Accordingly, I dissent from the majority's holding as to the extent of departure.

---

[37]I observe in passing that the majority seems to criticize the district court for not mentioning at sentencing that, as described in the PSR, Harris in 1975 had pleaded guilty to telephone harassment (no particulars being stated), the sentence for which was a $25 fine; that in respect to Harris's February 1980 divorce the "[c]ourt records . . . reflect [just how, whether in the pleadings or judgment or otherwise, is not stated], that the defendant was guilty of cruel and inhuman treatment during the marriage;" that in Harris's June 1973 divorce, the February 1973 "Bill for Divorce" (clearly referring to the wife's pleading initiating the divorce action, *not* to the "Final Decree of Divorce") "reflects" various bad treatment of the wife by Harris including that he "habitually threatened her with violence and struck and beat her on many occasions;" and that "[r]ecords of the Belmont, Mississippi, Police Department reflect the defendant was charged with disturbance or assault, but the charge was dropped by the plaintiff in January 1993" and there "was no information regarding details" of the matter. The district court can be presumed to be aware of these items in the PSR, and surely did not abuse its discretion in deeming them of insufficient importance to warrant express mention by it at sentencing.